IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 1, 2003 Session

STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v.
B.L.K. AND E.C.C.

Appeal from the Juvenile Court for Hamilton County
Nos. 169,829 and 169,830 and 169,831     Suzanne Bailey, Judge

FILED MAY 20, 2003

No. E2002-01724-COA-R3-JV

The State of Tennessee, Department of Children's Services ("DCS") obtained temporary custody of the five minor children of B.L.K. ("Mother") after Mother requested assistance from DCS because of her inability to care for the children due to her mental and financial condition. DCS later sought to terminate Mother's parental rights. Custody of Mother's two oldest children was transferred to their biological father. After a trial concerning Mother's parental rights to her three youngest children, the Juvenile Court determined there were sufficient grounds to terminate Mother's parental rights and that doing so was in the best interests of the children. Mother appeals, claiming DCS failed to prove by clear and convincing evidence that there were sufficient grounds to terminate her parental rights. Mother also claims DCS failed to prove by clear and convincing evidence that termination of her parental rights would be in the best interests of the children. We affirm the Juvenile Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Juvenile Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Jim K. Petty, Chattanooga, Tennessee, for the Appellant B.L.K.

Paul G. Summers, Attorney General and Reporter, and Douglas E. Dimond, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

Mother contacted DCS on April 22, 2000, asking for assistance in caring for her five minor children, currently ages 4, 5, 6, 11, and 12. Mother informed DCS that she was two months behind on her rent, was having emotional problems, and was undergoing counseling. A Petition for Temporary Custody was filed three days later, and the children came under DCS's temporary custody after the petition was granted by the Trial Court.

On May 25, 2000, a Permanency Plan ("Plan") was developed with the stated goal of returning the children to Mother. The Plan acknowledged Mother was receiving treatment and counseling for depression. The Plan directed Mother to continue such treatment until she emotionally was able to take care of the children. The Plan required Mother to maintain an income through employment and/or public assistance which was sufficient to enable her to care for the children. Mother also was instructed to maintain contact with DCS and cooperate with social service providers. The "expected achievement date" for Mother to complete the Plan's requirements was November of 2000. Mother signed the Plan and acknowledged that its contents and requirements were explained to her.

On June 26, 2000, Kimberly Ash ("Ash"), a DCS Case Manager, filed an interim report which updated the Trial Court on the status of the children in foster care as well as Mother's progress toward completing the Plan's requirements. Ash stated in that report that Mother was not maintaining contact with her and Mother's phone had been disconnected. During a scheduled visit, Mother told Ash that she would be starting a job in the near future. Mother then missed her next scheduled visit. Another interim report was filed on September 18, 2000. At that time, Ash reported Mother was continuing to visit her children and was continuing therapy. However, Mother had lost her job and was "constantly having transportation problems."

A third interim report was filed on January 16, 2001. By then, Mother's attendance at therapy had become sporadic, and she had been without medication for three months. Mother missed her re-certification meeting for food stamps because of transportation problems after her car was "hit" in an accident. Mother had to re-apply for benefits and was required to work one day per week at Goodwill in order to maintain those benefits. Mother reported to Ash that she had to borrow her neighbor's food stamp card in order to feed the children when they visited her. Mother's entertainment center and car had been repossessed. She was unable to keep her cell phone activated. Mother admitted being "involved" with a neighbor's married brother, but she denied any inappropriate activity took place while the children were visiting. Mother expressed her intent to return to Ohio where her family lived. Mother believed the support of her family would help her and that her employment opportunities would be better in Ohio. An interim report filed by Ash on June 26, 2001, states Mother continued to visit the children, although Mother expressed uncertainly several times about being able to manage the children. Ash went on to add that Mother "remains

unemployed, and was recently relocated to a one-bedroom apartment. After 14 months, [Mother] has made no sincere efforts to have her children returned."[1]

A second Permanency Plan was developed. This second Plan was approved by Mother on July 12, 2001. Mother's goals and expectations in the second Plan were identical to those in the first Plan, except the "expected achievement dates" were changed from November of 2000 to November of 2002.

On August 15, 2001, DCS filed a petition seeking to terminate Mother's parental rights to her youngest three children.[2] DCS alleged that: 1) Mother had abandoned the children by willfully failing to make reasonable payments toward the support of the children for four consecutive months immediately preceding the filing of the petition; 2) DCS had made reasonable efforts to assist Mother with establishing a suitable home for the children after they were placed into DCS custody, but Mother had made no reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children to such a degree that it was unlikely she could provide a suitable home for them at an early date; 3) the children had been removed from the home for at least six months, the conditions which led to their removal persisted, and there was little likelihood that these conditions would be remedied at an early date which would permit a safe return of the children to the home; and 4) continuation of the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home. DCS also alleged there had not been substantial compliance by Mother with the terms of the Plan, and due to Mother's mental and emotional condition she was incompetent to provide for the children. Finally, DCS alleged it would be in the best interests of the children for Mother's parental rights to be terminated.

In September of 2001, Ash filed another interim report with the Court, noting that while the children remained bonded with Mother, Mother remained unable to demonstrate that "she is able to parent, protect, and provide for her children on a consistent basis." Ash noted Mother finally had found another job but quit after three weeks because of transportation problems. Ash also discussed a situation involving one of the children falling off a top bunk of the bed and injuring himself when Mother was exercising visitation. Mother later told Ash the child complained of headaches and appeared sleepy. Mother explained she did not take the child to a hospital because she did not know if she could do that since DCS had custody of the child. The foster parents took the child to a hospital and, as it turns out, the child had cracked his skull and his head remained swollen for several days. The children also reported to Ash that Mother's "boyfriend" had "slept

---

[1] The father of Mother's two oldest children lived in Ohio. By June of 2001, he had petitioned the Trial Court for custody of his children. The State of Ohio undertook a home evaluation, etc., and eventually informed the Trial Court that the father would be able to care properly for the children. The father's petition for custody was granted and his two children went to live with him in Ohio. The remainder of the present litigation, therefore, focused solely on the remaining three youngest children.

[2] DCS also sought to terminate the parental rights of E.C.C., the father of the three youngest children. E.C.C.'s parental rights were terminated. He did not appeal. Accordingly, we will not discuss the trial testimony or facts which pertain only to E.C.C.

over" on several occasions, even though Mother had led Ash to believe this relationship had ended. The last interim report was filed with the Court on March 11, 2002, at which time Ash informed the Trial Court that Mother had moved back to Ohio and was maintaining sporadic contact with the children.

The trial began on March 8, 2002. Mother testified she returned to Toledo, Ohio in November of 2001 and has continued to reside there ever since. Mother acknowledged voluntarily relinquishing temporary custody of her children to DCS in April of 2000, and that the children have been in foster care since then. Mother relinquished temporary custody because she was not financially able to care for the children and had no emotional support in Tennessee. Her mental health at that time also prohibited her from properly caring for the children. When asked if she currently was mentally disabled, Mother initially responded "I don't know honestly", but later stated that she was not mentally disabled. Mother then was asked if she was seeking disability benefits from the State of Ohio on the basis that she was mentally disabled and unable to work. Mother responded that she did not know what to say. Mother later admitted to swearing under oath in a court proceeding that she mentally was unable to work. Notwithstanding the foregoing, Mother claimed to be more stable and more on track since returning to Ohio. While in Tennessee, Mother received mental health treatment from Dr. Supan beginning in April or May of 2000 and continuing until June of 2001, when her case was closed because of her failure to appear at appointments. Mother did have one additional counseling session prior to returning to Ohio and was placed on medication which seemed to help the depression. Mother discontinued her medication because she felt she did not need it anymore.

Mother acknowledged she did not provide any money toward the support of her children after they came under the temporary custody of DCS. She acknowledged she had enough money "coming into her house" off and on to take care of herself and that she received child support in the amount of $440 per month for approximately one year while the children were in DCS custody. Mother claimed she did not know she was supposed to provide any child support for her children. She did, however, provide for the children when she exercised visitation on the weekends. Mother had no income other than "general relief from welfare in Ohio." If she regained custody, Mother stated she would take care of the children either through disability payments or she would get a job. Mother admitted she was no better off financially now than she was two years ago. She was financially unable to support her children and it was uncertain when in the future she would be able to support them. Mother acknowledged it was unfair to her children to have to wait any longer for her to be able to take care of them, and they needed a stable and permanent home now.

Mother testified the Plan required her to maintain counseling, visit her children, and obtain a sufficient income to care properly for the children. Again, Mother acknowledged her counseling was terminated due to her lack of attendance, that she had no income at various times, that she did not pay any support towards the children when she did have income, and she was unemployed. Mother admitted to being unable to care for the children during the past two years and claimed she could care for them now but for the fact that she had no income. Mother lives in

-4-

subsidized housing with rental payments of $25 per month and feeds herself with the assistance of food stamps.

Mother also testified she moved to Tennessee with E.C.C. and his mother and at the outset they were able to care for all of the children. Mother was employed the first six months while in Tennessee, and E.C.C.'s mother helped with the babysitting. E.C.C. and his mother abruptly returned to Ohio, leaving her alone with all five children. Mother then lost her job and began feeling hopeless. Mother testified she had adequate housing to care for the children for a majority of the time they were in DCS custody. Mother eventually moved into a one bedroom apartment but has made arrangements to return to a larger apartment if her children are returned to her. Mother worked at Conagra and Race Mart International while the children were in DCS custody. She lost her job at Race Mart International after her car was totaled and she had no transportation. Mother then went to work at LaQuinta Inn but lost that job when a neighbor, who was providing her transportation, moved and she no longer had a way to get to work. Mother's car was totaled in a hit and run accident, and they never located the responsible driver. Mother has made several efforts to find work since returning to Ohio, including signing up for work at several temporary agencies. Mother has made an appointment for counseling. Although Mother denied having an alcohol problem, she admitted attending Court in November with the smell of beer on her breath. Mother also admitted she did not take one of her children to the doctor after he injured himself jumping on the bed.

After Mother's testimony was concluded, the trial was continued until April 29, 2002, at which time Mother again was called to testify. At that time, Mother continued to live in a one-bedroom apartment but was able to be transferred to a three bedroom apartment if she regained custody of the children. Mother had secured transportation and was employed at Owen's Corning. She worked at this job for only two days before returning to Tennessee for the second day of the trial. Mother testified to her efforts to secure employment since returning to Ohio. With her new job, she will be working 20 to 30 hours per week for the first 30 days and then full-time after that. The State of Ohio would assist Mother with obtaining child care services. While Mother still had not seen a therapist, an appointment was scheduled for May 6. Mother's claim for disability benefits was denied, and she has not pursued that claim any further. Mother no longer believed she was disabled.

Ash testified she is the DCS Case Manager assigned to this case. Ash stated she at one point thought Mother might be able to regain custody of the children, but Mother's situation quickly deteriorated. Other than possibly that one time, Mother has never been in a position to care for the children since they came into DCS custody. Ash developed a Permanency Plan for Mother and explained to her what needed to be done to regain custody of her children. Mother told Ash she was contemplating moving back to Ohio because she thought she could do better there, but it took Mother a year and a half to make that move. Ash stated Mother was able to obtain a few jobs but "quit them very quickly too." Buses were available to Mother when she had transportation problems, but Mother told Ash she did not know the bus system. Mother's treatment was closed by the therapist because of missed appointments. Although Mother claimed she could not find a job, Ash pointed out Mother was able to go camping with her sister and attend Mardi Gras. Mother made statements to Ash that she was not even sure she wanted her children back because they were so

demanding. Ash went on to discuss some of the events described in her interim reports, as already set forth previously, such as the incident where one of the children fractured his skull. Ash was not aware that Mother had secured employment a few days prior to the second day of the hearing.

After the above testimony was concluded, the Guardian ad Litem informed the Trial Court that she believed it was in the best interests of the children for Mother's parental rights to be terminated.

The Trial Court entered a final decree on June 25, 2002, terminating Mother's parental rights. In the final decree, the Trial Court stated that after considering all of the testimony and other evidence submitted at trial, it found by clear and convincing evidence that: the children had been removed from the home and were in the custody of DCS for at least six months; DCS had made reasonable efforts for at least four months to assist Mother with establishing a suitable home; Mother has made no reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children to such a degree that it was unlikely she could provide a suitable home at an early date; the conditions which led to the removal of the children persisted and there was little likelihood that these conditions would be remedied at an early date so the children could be returned to the home; continuation of the legal parent and child relationship would greatly diminish the children's chances of early integration into a stable and permanent home; Mother failed to comply in a substantial manner with the reasonable requirements of the Plan; Mother willfully abandoned the children for more than four consecutive months preceding the filing of the petition; Mother's mental and emotional condition was such that she was incompetent to care for the children and her mental condition was likely to remain such that she would be unable to assume responsibility for the children in the near future, and; it was in the best interests of the children for Mother's parental rights to be terminated.

Mother filed a Notice of Appeal and a Uniform Civil Affidavit of Indigency.[3] In a thorough and well written brief by appointed counsel, Mother appeals the final decree of the Juvenile Court. Mother asserts DCS failed to prove by clear and convincing evidence that there were sufficient grounds to terminate her parental rights. Mother also claims DCS failed to prove by clear and convincing evidence that termination of her parental rights was in the best interests of the children.

**Discussion**

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference

---

[3] We note that Mother was no longer employed when she filed this Affidavit of Indigency. Because her job loss occurred after the trial and thus could not have impacted on the Trial Court's ruling, we will not consider this fact on appeal.

to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In *State v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).
>
> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:
>
>> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v.*

> *Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985)....

*State v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at \*\*16-18 (Tenn. Ct. App. Dec. 28, 2001).

Termination of parental rights may be based upon a number of statutory grounds contained in Tenn. Code Ann. § 36-1-113(g). The four grounds upon which the Juvenile Court based its ruling are:

(1)    Abandonment by the parent or guardian, as defined in [prior law], has occurred;[4]

(2)    There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A)    The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

    (i)    The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's

---

[4] The statutory definition of "abandonment" referenced in this statute has been declared unconstitutional. Hence, we have substituted "prior law" to reference the law which is to be applied until the statute is amended by the legislature.

safe return to the care of the parent(s) or guardian(s), still persist;

    (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

    (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

\* \* \* \*

(8)(A)    The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child.

  (B)    The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

    (i)     The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and

    (ii)    That termination of parental or guardian rights is in the best interest of the child.

Tenn. Code Ann. §§ 36-1-113(g)(1) - (g)(3), and (g)(8).

       The Juvenile Court found there was clear and convincing evidence that all four of these statutory grounds for termination of Mother's parental rights had been met. In making this

determination, the Juvenile Court heard the testimony of the witnesses, including the DCS representative and Mother. "Unlike this Court, the [Juvenile Court] observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We find no such "clear and convincing evidence to the contrary" in this record.

Based on our review of the record, including the facts detailed above, we do not believe the Juvenile Court committed any reversible error in reaching its conclusion that clear and convincing evidence existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii). There has been substantial noncompliance with the terms of the Plan. The proof showed Mother consistently was unable to support the children financially and Mother's therapy sessions were stopped due to her lack of attendance. Mother admitted she was unable to care for the children for the two years they have been in DCS custody. Mother's last minute ability to secure employment two days before the second day of trial began, as well as the scheduling of a therapy session in the near future is, quite simply, too little too late. These and other facts as previously set forth establish Mother's substantial noncompliance with the terms of the Plan. Furthermore, Mother's financial and emotional instability were the conditions leading to the removal of the children and the Trial Court did not commit reversible error when it concluded these problems still persisted and that the other factors set forth in Tenn. Code Ann. §§ 36-1-113(g)(3)(A)(i) - (iii) likewise were proven by clear and convincing evidence.

Because we affirm the termination of Mother's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii), we pretermit the issues of whether there was sufficient proof that the children had been abandoned by Mother for willfully failing to support them, and whether Mother's mental condition rendered her incompetent to provide adequately for the further care and supervision of the children.

Having affirmed that two statutory grounds for termination were proven by clear and convincing evidence, we next address Mother's claim that it was not proven by clear and convincing evidence that the termination of her parental rights was in the best interests of the children. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines

promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). After considering all relevant statutory factors in light of the record before us, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence established that it was in the best interest of the children to terminate Mother's parental rights.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant B.L.K.

_____
D. MICHAEL SWINEY, JUDGE